No. 20-50774

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

DOCTOR GEORGE RICHARDSON, ROSALIE WEISFELD, MOVE
TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS,
AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH
DISABILITIES,

Plaintiffs-Appellees,

v.

FEDERICO FLORES, JR.; MARIA GUERRERO; VICENTE
GUERRERO,

Movants-Appellants,

v.

TEXAS SECRETARY OF STATE, RUTH R. HUGHS,

Defendant-Appellant-Appellee,

_____

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

_____

## PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANT-APPELLANT'S PRINCIPAL BRIEF AND MOVANTS-APPELLANTS' PRINCIPAL BRIEF

Richard Mancino
rmancino@willkie.com
Samuel Kalar
skalar@willkie.com
JoAnna Suriani
jsuriani@willkie.com

Mimi M.D. Marziani
mimi@texascivilrightsproject.org
Hani Mirza
hani@texascivilrightsproject.org
Ryan V. Cox
ryan@texascivilrightsproject.org

WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)

TEXAS CIVIL RIGHTS PROJECT

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, AUSTIN JUSTICE COALITION, and COALITION OF TEXANS WITH DISABILITIES, | ) ) ) ) ) ) ) ) |
| | ) |
| *Plaintiffs-Appellees,* | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERICO FLORES, JR.; MARIA GUERRERO; VICENTE GUERRERO, | ) ) ) |
| | ) |
| *Movants-Appellants,* | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| TEXAS SECRETARY OF STATE, RUTH R. HUGHS, | ) ) |
| | ) |
| *Defendant-Appellant-Appellee,* | ) ) |
| | ) |

No. 20-50774
USDC No. 5:19-cv-00963-OLG

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Ruth R. Hughs, in her official capacity as Texas Secretary of State, Defendant-Appellant-Appellee
2. Trudy Hancock, in her official capacity as Brazos County Elections Administrator
3. Perla Lara, in her official capacity as City of McAllen, Texas Secretary
4. Federico Flores, Jr., Movant-Appellant
5. Maria Guerrero, Movant-Appellant
6. Vicente Guerrero, Movant-Appellant
7. Jerad Navjar, Counsel for Movant-Appellant
8. Austin Whatley, Counsel for Movant-Appellant
9. Ken Paxton, Counsel for Defendant-Appellant-Appellee
10. Jeffrey C. Mateer, Counsel for Defendant-Appellant-Appellee
11. Ryan L. Bangert, Counsel for Defendant-Appellant-Appellee
12. Matthew H. Frederick, Counsel for Defendant-Appellant-Appellee
13. Beth Klusmann, Counsel for Defendant-Appellant-Appellee
14. Dr. George Richardson, Plaintiff-Appellee
15. Rosalie Weisfeld, Plaintiff-Appellee
16. Coalition of Texans with Disabilities, Plaintiff-Appellee
17. Austin Justice Coalition, Plaintiff-Appellee
18. MOVE Texas Civic Fund, Plaintiff-Appellee
19. League of Women Voters of Texas, Plaintiff-Appellee
20. Richard Mancino, Counsel for Plaintiffs-Appellees
21. Samuel Kalar, Counsel for Plaintiffs-Appellees

22. JoAnna Suriani, Counsel for Plaintiffs-Appellees
23. Mimi M.D. Marziani, Counsel for Plaintiffs-Appellees
24. Hani Mirza, Counsel for Plaintiffs-Appellees
25. Ryan V. Cox, Counsel for Plaintiffs-Appellees

Respectfully submitted this 15th day of March 2021.

/s/     *Hani Mirza*

Texas Bar Number: 24083512

Telephone: 972-333-9200 ext. 171

Attorney for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

The issues on appeal raised by Defendant-Appellant Texas Secretary of State merit oral argument. Plaintiffs-Appellees respectfully request oral argument in order to aid in a full and complete consideration of the issues. The intervention question raised by Movants-Appellants does not merit oral argument.

# TABLE OF CONTENTS

Certificate Of Interested Persons ..................................................................i

Statement Regarding Oral Argument .......................................................... iii

Table Of Authorities..................................................................................vi

I.   Statement Of Jurisdiction .....................................................................1

II.  Issues Presented .................................................................................1

III. Statement Of The Case........................................................................1

  A.  Procedural Background ......................................................................1

  B.  Undisputed Facts ..............................................................................3

    1.  Mail-In Voting Process.....................................................................3

    2.  The Signature-Comparison Procedure Is A Poor Proxy For
    Identity Verification .............................................................................8

IV.  Summary Of The Argument ...............................................................13

V.  Standard Of Review............................................................................15

VI.  Argument .........................................................................................15

  A.  Plaintiffs Have Article III Standing .................................................15

    1.  Plaintiffs Demonstrate An Injury-In-Fact.....................................16

    2.  Plaintiffs Satisfy Causation And Redressability...........................25

  B.  Sovereign Immunity Does Not Bar Plaintiffs' Claims ....................28

    1.  SOS Is Sufficiently Connected To Enforcement Of The Signature-
    Comparison Provisions .......................................................................29

    2.  *Young* Does Not Prevent The District Court From Requiring SOS
    To Notify Local Officials .....................................................................34

  C.  Texas' Signature-Comparison Procedure Is Unconstitutional ......37

    1.  SOS Violates The Equal Protection Clause And The Signature-
    Comparison Procedure Causes An Undue Burden On The Right To
    Vote .....................................................................................................37

    2.  SOS Violates Procedural Due Process ..........................................45

  D.  The District Court's Injunction Was Proper .................................65

E.  The District Court Did Not Clearly Abuse Its Discretion By Denying Movants-Appellants' Motion To Intervene ............................. 67

VII.  Conclusion ................................................................................. 67

Certificate Of Compliance ................................................................ 69

Certificate Of Service .................................................................... 69

# TABLE OF AUTHORITIES

**Cases**

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*,
851 F.3d 507 (5th Cir. 2017)..........................................................29

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)................................................................. passim

*Arnaud v. Odom*,
870 F.2d 304 (5th Cir. 1989)........................................................47

*Ashby v. White*,
2 Ld Raym 938 (1702)..................................................................48

*Ass'n of Cmty Orgs. for Reform Now v. Fowler*,
178 F.3d 350 (5th Cir. 1999)........................................................22

*AT&T Comm'ns v. BellSouth Telecomms. Inc.*,
238 F.3d 636 (5th Cir. 2001)........................................................28

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)......................................................................46

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915)......................................................................55

*Bolling v. Sharpe*,
347 U.S. 497 (1954)......................................................................53

*Burdick v. Takushi*,
504 U.S. 428 (1992.........................................................38, 49, 56

*Bush v. Gore*,
531 U.S. 98 (2000) .......................................................................45

*Carey v. Piphus*,
435 U.S. 247 (1978)................................................................17, 52

*Carney v. Adams*,
141 S.Ct. 493 (2010) ...................................................................19

*Caruso v. Yamhill County ex rel. County Comm'r*,
422 F.3d 848, 855 (9th Cir. 2005)...............................................57

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019)..........................................29, 30, 33

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009)....................................................18

*Cook v. Randolph County, Ga.,*
573 F.3d 1143 (11th Cir. 2009)......................................................49
*Crawford v. Marion Cty. Election Bd.,*
553 U.S. 181 (2008)............................................................. passim
*Davis v. Schnell,*
81 F. Supp. 872 (S.D. Ala. 1949) ..............................................60, 61
*Democracy N.C. v. N.C. State Bd. of Elections,*
476 F. Supp. 3d 158 (M.D. N.C. 2020) ..........................................14
*Democratic Exec. Comm. of Fla. v. Detzner,*
347 F. Supp. 3d 1017 (N.D. Fla. 2018)..........................................14
*Democratic Exec. Comm. of Fla. v. Lee,*
915 F.3d 1312 (11th Cir. 2019)........................................14, 35, 39
*Duncan v. Poythress,*
657 F.2d 691 (5th Cir. B 1981) ......................................47, 49, 54
*Ex parte Robbins,*
560 S.W.3d 130 (Tex.Crim.App. 2016) ..........................................7
*Ex parte Young,*
209 U.S. 123 (1908)............................................................. passim
*Fla. Democratic Party v. Detzner,*
2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ..............................14, 39
*Frederick v. Lawson,*
481 F. Supp. 3d 774 (S.D. Ind. 2020) ..................................14, 22, 39
*Goldberg v. Kelly,*
397 U.S. 254 (1970)...........................................................53, 56
*Gray v. Sanders,*
372 U.S. 368 (1963)................................................................48
*Harper v. Virginia State Bd. of Elections,*
383 U.S. 663 (1966)...........................................................46, 48
*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982)...........................................................22, 24
*Hollingsworth v. Perry,*
570 U.S. 693 (2013)................................................................19
*Inclusive Communities Project, Inc. v. Dep't of Treasury,*
946 F.3d 649 (5th Cir. 2019).....................................................64

*Jacobson v. Florida Secretary of State,*
974 F.3d 1236 (11th Cir. 2020)......................................................66

*Johnson v. Hood,*
430 F.2d 610 (5th Cir. 1970)..........................................................54

*Jones v. Governor of Florida,*
975 F.3d 1016 (11th Cir. 2020)............................................ 54, 55, 56

*K.P. v. LeBlanc,*
627 F.3d 115 (5th Cir. 2010)..........................................................29

*Larson v. Domestic & Foreign Commerce Corporation,*
337 U.S. 682 (1949)........................................................................34

*League of Women Voters of North Carolina v. North Carolina,*
769 F.3d 224 (4th Cir. 2014)..........................................................40

*League of Women Voters of Ohio v. Brunner,*
548 F.3d 463 (6th Cir. 2008)..................................................... 49, 50

*League of Women Voters of the United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016)............................................................66

*Libertarian Party of Ohio v. Husted,*
751 F.3d 403 (6th Cir. 2014)..........................................................67

*Martin v. Kemp,*
341 F. Supp. 3d 1326 (N.D. Ga. 2018) *appeal dismissed sub nom*14, 18, 53

*Martin v. Sec'y of State of Ga.,*
2018 WL 7139247 (11th Cir. Dec. 11, 2018) ........................................14

*Mathews v. Eldridge,*
424 U.S. 319 (1976)................................................................. passim

*McDonald v. Board of Election Commissioners of Chicago,*
394 U.S. 802 (1969)................................................................. 51, 52

*McDonald v. City of Chicago, Ill.,*
561 U.S. 742 (2010)........................................................................46

*Memphis A. Phillip Randolph Institute v. Hargett,*
482 F. Supp. 3d 673 (M.D. Tenn. 2020) .......................................... 49, 50

*Mi Familia Vota v. Abbott,*
977 F.3d.461 (5th Cir. 2020)....................................................... 32, 37

*Milliken v. Bradley,*
433 U.S. 267 (1977).......................................................................35

*Minor v. Happersett,*
  88 U.S. 162 (1874) ......................................................................53

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of
  Jacksonville, Fla.,*
  508 U.S. 656 (1993)......................................................................18

*Norman v. Reed,*
  502 U.S. 279 (1992)......................................................................41

*Obergefell v. Hodges,*
  576 U.S. 644 (2015)......................................................................46

*OCA-Greater Houston v. Tex.,*
  2018 WL 2224082 (W.D. Tex. May 15, 2018)..............................35, 66

*OCA-Greater Houston v. Tex.,*
  867 F.3d 604 (5th Cir. 2017)...................................................... passim

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001)........................................................29

*Opulent Life Church v. City of Holly Springs,*
  697 F.3d 279 (5th Cir. 2012)........................................................66

*O'Shea v. Littleton,*
  414 U.S. 488 (1974)......................................................................20

*Quern v. Jordan,*
  440 U.S. 332 (1979)......................................................................35

*Raetzel v. Parks/Bellemont Absentee Election Bd.,*
  762 F. Supp. 1354 (D. Ariz. 1990) ............................................14, 17

*Reynolds v. Sims,*
  377 U.S. 533 (1964)............................................................39, 48, 51

*Saine v. Hospital Authority of Hall County,*
  502 F.2d 1033 (5th Cir. 1974)..................................................35, 37

*Saucedo v. Gardner,*
  335 F. Supp. 3d 202 (D.N.H. 2018) ..........................................14, 59

*Self Advocacy Sols. N.D. v. Jaeger,*
  464 F. Supp. 3d 1039 (E.D. N.D. 2020) ................................14, 18, 25

*Sommers v. Bank of Am., N.A.,*
  835 F.3d 509 (5th Cir. 2016)..........................................................1

*Sotto v. Wainwright,*
  601 F.2d 184 (5th Cir. 1979)........................................................47

*Strauss v. United States,*
311 F.2d 926 (5th Cir. 1963).................................................................63

*Stringer v. Whitley,*
942 F.3d 715 (5th Cir. 2019).................................................................19

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)................................................................. 16, 20

*Tashjian v. Republican Party of Connecticut,*
479 U.S. at 208 (1986) .................................................................51, 57

*Taylor v. Beckham,*
178 U.S. 548 (1900)................................................................53

*Tex. Indep. Party v. Kirk,*
84 F.3d 178 (5th Cir. 1996).................................................................57

*Texas Democratic Party v. Abbott,*
978 F.3d 168 (5th Cir. 2020)................................................ passim

*Thole v. U.S. Bank N.A.,*
140 S.Ct. 1615 (2020) .................................................................15

*Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.,*
756 F.3d 380 (5th Cir. 2014).................................................................35

*Timbs v. Indiana,*
139 S.Ct. 682 (2019) .................................................................46

*Timmons v. Twin Cities Area New Party,*
520 U.S. 351 (1997).................................................................57

*Toney-El v. Franzen,*
777 F.2d 1224 (7th Cir. 1985).................................................................50

*U.S. v. Atkins,*
323 F.2d 733 (5th Cir. 1963)................................................ passim

*U.S. v. Classic,*
313 U.S. 299 (1941)................................................................. 49, 51

*U.S. v. Ismoila,*
100 F.3d 380 (5th Cir. 1996).................................................................62

*U.S. v. State of Tex.,*
252 F. Supp. 234 (W.D. Tex. 1966).................................................................47

*U.S. v. Students Challenging Regul. Agency Procedures (SCRAP),*
412 U.S. 669 (1973).................................................................16

*United States v. Cashio,*
    420 F.2d 1132 (5th Cir. 1969)................................................................62

*United States v. Haymond,*
    139 S.Ct. 2369 (2019) ......................................................................46

*United States v. W.T. Grant Co.,*
    345 U.S. 629 (1953)..........................................................................27

*Vann v. Kempthorne,*
    534 F.3d 741 (D.C. Cir. 2008)..........................................................35

*Voting Integrity Project, Inc. v. Bomer,*
    199 F.3d 773 (5th Cir. 2000)............................................................15

*Walker v. Beaumont Indep. Sch. Dist.,*
    938 F.3d 724 (5th Cir. 2019)..............................................................6

*Weber v. Shelley,*
    347 F.3d 1101 (9th Cir. 2003)..........................................................57

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) .............................................................................48

*Wilkinson v. Austin,*
    545 U.S. 209 (2005)..........................................................................52

*Williams v. Rhodes,*
    393 U.S. 23 (1968) ...........................................................................49

*Williams v. Taylor,*
    677 F.2d 510 (5th Cir. 1982).....................................................49, 55, 56

*Wilson v. Birnberg,*
    667 F.3d 591 (5th Cir. 2012)........................................................55, 56

*Zessar v. Helander,*
    2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ....................................14

## Statutes and Rules

28 U.S.C. § 1291 ...................................................................................1

52 U.S.C. § 21083(b)(2)(A)..................................................................65

Fed. R. App. P. 28(i) ...........................................................................67

Fed. R. Evid. 201 .................................................................................6

Tex. Elec. Code § 1.011(a) .................................................................40

Tex. Elec. Code § 31.002................................................8, 26, 30, 32

Tex. Elec. Code § 31.002(a) ...............................................................26

Tex. Elec. Code § 31.002(d) ...................................................................26

Tex. Elec. Code § 31.003...........................................................8, 33, 36

Tex. Elec. Code § 31.004...............................................................33, 36

Tex. Elec. Code § 31.005...........................................................33, 36, 37

Tex. Elec. Code § 31.091(1) ......................................................................6

Tex. Elec. Code § 52.002........................................................................32

Tex. Elec. Code § 64.012(a)(2) ................................................................7

Tex. Elec. Code § 84.007...........................................................................3

Tex. Elec. Code § 86.006(a) ......................................................................3

Tex. Elec. Code § 86.011(d) ......................................................................6

Tex. Elec. Code § 86.013(c).......................................................................4

Tex. Elec. Code § 87.002...........................................................................4

Tex. Elec. Code § 87.027...........................................................................4

Tex. Elec. Code § 87.027(i) .................................................... 4, 5, 20, 28

Tex. Elec. Code § 87.041...........................................................................4

Tex. Elec. Code § 87.041(b)(2) .................................................................4

Tex. Elec. Code § 87.041(e).................................................... 4, 5, 20, 28

Tex. Elec. Code § 87.041(f) ..............................................................4, 28

Tex. Elec. Code § 87.0431..........................................................................5

Tex. Elec. Code § 87.127............................................................................6

Tex. Elec. Code §§ 31.001 .................................................................8, 33

Tex. Elec. Code §§ 31.001–.005 ....................................... 26, 29, 31, 32

Tex. Elec. Code §§ 31.004–31.005 ..........................................................8

Tex. Elec. Code §§ 82.001–.004 ..............................................................3

Tex. Elec. Code §§ 86.005(a)–(c)............................................................3

## Other Authorities

Erwin Chemerinsky, Substantive Due Process,
15 Touro L. Rev. 1501 (1999) ............................................................50

John William Smith, et al., *A Selection of Leading Cases on Various Branches of the Law* 355 (Vol. 1, 1855) ...............................................48

## Constitutional Provisions

U.S. Const. Art. I § 2 ...........................................................................48

U.S. Const. Art. I § 4, cl. 1.....................................................................51

# I. STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's partial summary judgment ruling was final. ROA.5475–5476, 5542, 5563–67. This Court's jurisdiction over the district court's denial of Movants-Appellants' request for permissive intervention is provisional: if the district court did not abuse its discretion, the Court must dismiss Movants-Appellants' appeal for lack jurisdiction. *Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 512 (5th Cir. 2016).

# II. ISSUES PRESENTED

Whether:

1. Rosalie Weisfeld and the Coalition of Texas with Disabilities have standing;

2. The exception to sovereign immunity applies to the Texas Secretary of State;

3. The signature-comparison procedure violates the Constitution;

4. The partial permanent injunction is proper; and

5. Movant-Appellants' motion was properly denied.

# III. STATEMENT OF THE CASE

## A. Procedural Background

The plaintiffs in the underlying case filed this lawsuit in August 2019. ROA.27–52. Defendant Texas Secretary of State's ("SOS's")

subsequent motion to dismiss the lawsuit was denied. ROA.255–87. The plaintiffs designated an expert witness, Dr. Linton Mohammed, a certified Forensic Document Examiner ("FDE") and expert on signature comparison, and served his expert report on all parties in February 2020. ROA.338–39, 905–61, 5472–73. SOS designated no experts. Following the close of discovery in May 2020, the parties filed cross-motions for summary judgment. ROA.5472. In August 2020, after summary-judgment briefing had concluded, Movants-Appellants ("Movants"), plaintiffs in a separate action pending in the Southern District of Texas, filed a motion to intervene and stay proceedings. ROA.5112–25, 5546–47 n.48. In September 2020, the district court entered an order granting partial summary judgment for Rosalie Weisfeld ("Weisfeld") and the Coalition of Texans with Disabilities ("CTD") (collectively "Plaintiffs") on their constitutional claims, denying SOS's motion for summary judgment as to those issues, and issuing a partial permanent injunction. ROA.5564–67. The district court also denied Movants' motion to intervene and held in abeyance consideration of the remaining claims and relief. ROA.5564–67, 5546–47 n.48. A motions panel of this Court

granted SOS's request for a stay pending appeal in October 2020. Dkt. 00515606369.

## B. Undisputed Facts

### 1. Mail-In Voting Process

The Texas Election Code ("Election Code") permits mail-in voting if a voter is 65 or older, has a disability, is confined in jail, or is absent from their county of residence during an election. Tex. Elec. Code §§ 82.001–82.004. To mail-in vote, voters must send their Early Voting Clerk ("EVC") an application for ballot by mail ("ABBM") via mail—or mail and fax or email—by 11 days before Election Day. *Id.* § 84.007; ROA. 613–14.

Upon accepting their ABBMs, the EVC sends voters mail-in ballot materials, which include a "Dear Voter" letter, ballot, ballot envelope, and carrier envelope. ROA.616, 5466. To cast a mail-in ballot: voters must mark the ballot; place and seal it in the ballot envelope; place and seal the ballot envelope within the carrier envelope; sign a certificate on the carrier envelope, which includes a line for the voter's signature across the seal flap and the back of the envelope; and then return the envelope to the EVC. Tex. Elec. Code §§ 86.005(a)–(c), 86.006(a). The certificate requires voters to "certify that the enclosed ballot expresses [their]

wishes independent of any dictation or undue persuasion by any person."
*Id.* § 86.013(c).

Temporarily-appointed layperson members of Early Voting Ballot Boards ("EVBBs") or Signature Verification Committees ("SVCs") are tasked with comparing mail-in voters' signatures for identity verification. *Id.* §§ 87.002, 87.027, 87.041. EVBBs and SVCs must reject otherwise duly-cast ballots if they determine the ABBM or carrier envelope was "executed by a person other than the voter." *Id.* §§ 87.027(i), 87.041(b)(2), (e), (f). The Election Code only requires that local election officials "compare" these signatures to determine whether they are signed by the voter. *Id.* Instructions from SOS, however, require SVCs to determine whether signatures "match" and are the "same." ROA.594, 596. The Election Code and SOS provide no guidance on how to compare signatures to verify whether they are executed by a person other than the voter, and neither account for the possibility that an individual's signature may vary for any number of innocuous reasons. ROA.662; ROA.671–72 (Brazos EVC considering "similar enough" as a "reasonable person's acceptance"); ROA.5511–12 (Brazos EVBBs applying "reasonable person" test and McAllen EVBBs requiring signatures

"resemble each other"). EVBBs and SVCs can also compare a voter's two signatures "with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar[.]" Tex. Elec. Code §§ 87.041(e), 87.027(i).

The EVBB's decision to accept or reject a ballot is final. ROA.2639–40. At the time this lawsuit was filed, the ABBM and the mail-in ballot materials did not instruct voters how to sign the ABBM and carrier envelope. ROA.515–19, 613–14, 616, 5467, 5535 n.39. These materials also did not inform voters their signatures would be compared with each other and/or additional signatures to verify identity. *Id.* Due to this litigation, the "Dear Voter" letter—which voters receive only after submitting their signed ABBM—now includes the single reference to the signature-comparison procedure. ROA.5380, 5535 n.39.

The EVBB's presiding judge must send a rejection notice by 10 days after Election Day. Tex. Elec. Code § 87.0431. Voters generally receive rejection notices after Election Day. ROA.5517.

Voters who receive a rejection notice cannot viably challenge an improper rejection. While the Election Code contemplates that voters may request county EVCs challenge a rejection in court, these EVCs are

not required to act on any such request—assuming the request is received before the canvassing date—and the Brazos EVC testified she does not review signature-comparison determinations and has never petitioned for this relief. ROA.533–35, 663–67, 2637–39, 5518–19; Tex. Elec. Code § 87.127. This provision is also inapplicable to non-county elections administrators. *Id.* §§ 31.091(1), 87.127; ROA.691–692, 5519. SOS could only identify one instance of the provision's implementation ever. ROA.533–35, 5519.

Although Election Code Section 86.011(d) grants EVCs authority to allow voters to correct defects—like missing signatures—on carrier envelopes, this option is available at the EVC's sole discretion and unavailable once the carrier envelope is sent for signature comparison. ROA.2995–97; Pub. Hearing Before the Tex. House of Representative Comm. on Elections, 87nd Leg., R.S. 1:41:08–1:41:56 (Mar. 4, 2021) (Testimony of Keith B. Ingram of SOS).[1]

---

[1] Available at:
https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=19496.

Pursuant to Federal Rule of Evidence 201, Plaintiffs request this Court take judicial notice of the March 4, 2021 hearing before the State of Texas House of Representative Committee on Elections. "Judicial notice may be taken of matters of public record." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *Ex parte*

SOS considers voting in-person or casting another mail-in ballot after receiving a mail-in ballot rejection notice illegally voting twice, a felony offense. ROA.2949 (filed separately under seal as District Court Dkt. 85-2 at 33); ROA.5108–5111; Tex. House of Representative Comm. on Elections, *supra* 58:34–59:11 (Testimony of Keith B. Ingram of SOS) (testifying that voters whose mail-in ballots are rejected cannot vote in-person because that would be a "double vote"); Tex. Elec. Code § 64.012(a)(2). Consequently, even voters who receive a rejection before Election Day and are able to vote in-person cannot save themselves from disenfranchisement.

Election contests also remain an infeasible option because such suits serve the interests of candidates, not voters attempting to avoid disenfranchisement. ROA.5520–21. Most voters also lack the time and/or substantial financial resources required to sue to reverse a rejection in federal or state court.

SOS, Texas' chief elections officer, is responsible for ensuring uniformity in the application, operation, and interpretation of election

---

*Robbins*, 560 S.W.3d 130, 157–158 (Tex.Crim.App. 2016) (citing Texas legislative committee hearings) (Newell, J. concurring).

laws across jurisdictions. Tex. Elec. Code §§ 31.001, 31.003. SOS prescribes the design and content of mail-in voting forms, including forms vital to the signature-comparison procedure. *Id.* § 31.002. SOS also directs and advises local officials on election laws. *Id.* §§ 31.004–31.005.

## 2. The Signature-Comparison Procedure Is A Poor Proxy For Identity Verification

### i. Plaintiffs' Disenfranchisement

The signature-comparison procedure's consequences are severe. Weisfeld, who mail-in voted while away from home, suffered disenfranchisement when the McAllen EVBB incorrectly determined that one of her signatures was not hers, despite Weisfeld serving previously on a local EVBB, serving as an election administrator for local primary elections, and sending handwritten communications to McAllen leading up to the election she suffered disenfranchisement in. ROA.5469–70, 5515–16. Dr. George Richardson ("Richardson"), another plaintiff in the underlying case, is over 65 and suffered the same injury; when he approached the Brazos EVC's office about the EVBB's incorrect determination, they told him the EVBB "eye ball[ed]" his signatures and that there was nothing the EVC could do about his rejection. ROA.1027–28, 5469–70.

Weisfeld will exclusively mail-in vote while traveling, due to her disability caused by a traumatic brain injury, and once she turns 65 this June, and her votes will undergo the same signature-comparison procedure. ROA.1082, 5470, 5479. CTD counteracts the signature-comparison procedure by educating voters with disabilities on how to sign voting materials in order to help reduce the chance of improper signature-comparison rejections. ROA.2276–77, 5470–71.

### ii. Reasons Signatures Vary

As the expert testified, a person's signature may vary for all manner of innocuous reasons. This includes accidental occurrences; alternative styles; ambidexterity; carelessness or negligence; changes in the health condition of the writer; changes in the physical condition of the writer, such as fractures, fatigue, or weakness; changes in the mental condition or state of the writer; concentration on the act of writing; drugs or alcohol; influence of medications; nervous tension; natural variations as a result of differences in neuro-muscular coordination; writing conditions, such as whether in a moving vehicle or at a stationary table; writing instrument, such as a pen or a stylus; writing position, such as the individual's stance; and writing surface, such as paper versus electronic

screen; and writing under stress. ROA.922–24, 971. Studies show that "elderly [and] disabled writers … have less pen control than most other writers" and therefore, "have a greater range of variation in their signatures." ROA.924, 981–82, 5501 n.24.

### iii. Signature Reviewers Receive No Training And Insufficient Guidance, Writing Samples, And Time To Review

Layperson EVBBs and SVCs receive no training on how to determine if signatures were made by the same person. ROA.626–28, 722, 5468, 5512. EVBBs and SVCs are only provided the SOS-created EVBB and SVC Handbook for Election Judges and Clerks ("Handbook"), which does not provide training on making such determinations. ROA.536–39, 594, 596, 660, 719–23, 5468. Apart from repeating excerpts from the Election Code, the Handbook additionally states on signature comparison that SVC members "are not handwriting experts[,]" "it is at the discretion of the committee members to use their best judgment and to verify if these signatures are the same[,]" and "[t]he committee members must use their best judgement if the signatures match." ROA.594, 596, 5468.

The expert concluded that "untrained" EVBB and SVC members are

> very likely to make mistakes when comparing signatures and are particularly likely to reject signatures erroneously as inauthentic or non-matching when they are in fact written by the same individual.

ROA.916–29, 1379; ROA.5512 ("possible for different [Brazos EVBB] teams to reach a different conclusion with respect to the same ballot" and "McAllen EVBB members have previously had 'a hard time agreeing on signatures.'"). This is particularly true with respect to the signatures of elderly voters and voters with disabilities. ROA.916–17, 924.

EVBBs and SVCs are specifically provided no training on how to "discern whether a feature or combination of features in signatures" constitute "variations" of a voter's handwriting versus unexplainable "differences" outside their range of variation. ROA.919. Distinguishing between the two is "one of the most difficult determinations in signature examinations, even for experienced FDEs." *Id.* Making such judgments reliably requires, at minimum: years of training under an FDE, including learning the science of signature examination; gaining experience in casework; testing for proficiency; adequate magnification and lighting equipment; excellent eyesight; and adequate time—between two and four

hours per assessment. ROA.915, 919–20, 972. The expert concluded that, without these prerequisites, EVBB and SVC members are likely to "conclude incorrectly that someone other than the registered voter signed the mail-in ballot or [ABBM]." ROA.919–20, 5512–13.

Even "given proper examination conditions," professionally trained FDEs require ten signature samples at minimum "for an accurate signature determination to account for an individual's signature variability." ROA.915; ROA.970 (number tends to increase to "15 to 20" because "[i]n today's world where people are not taught to write, you're going to get more variation in signatures."). This minimum amount can also "increase exponentially in cases where the writer is ill, disabled, elderly, or has other handwriting issues." ROA.915. "[F]ailure to use adequate specimens fully representing the range of variation in a writer's signature" is a "well-known source of error." ROA.930–31.

However, Texas law does not require EVBBs and SVCs review more than the carrier envelope and ABBM signatures when making determinations. ROA.530–32, 564, 566, 575, 594, 596 5514–15. The Election Code and officials also do not request or require voters provide

the same style of signatures, despite even experts being unable to accurately compare signatures of different styles. ROA.5513.

Studies show that laypersons have far higher signature-examination error rates than FDEs. ROA.917–18 (finding laypersons had 26.1% error rate versus FDEs' 7.05% error rate when reviewing genuine signatures; another finding laypersons had 19.3% error rate versus FDEs' 3.4% error rate even when given "adequate signature samples and examination time"). Given the EVBBs' and SVCs' limited amount of time and comparison material, the expert testified that "no amount of guidance will help them." ROA.4098.

## IV.  SUMMARY OF THE ARGUMENT

This appeal arises from the district court's order granting partial summary judgment in favor of Plaintiffs on their Fourteenth Amendment claims and partial permanent injunctive relief.

The signature-comparison procedure is unconstitutional because it imposes an unjustified, discriminatory, and arbitrary burden on the right to vote, and discards duly-cast ballots without providing meaningful procedural safeguards. The district court's 103-page summary judgment opinion was carefully grounded in voluminous record evidence, the plain

language of Texas election law, and established precedent. The district court's holding is consistent with rulings from federal courts across the country that have held unconstitutional similar signature-comparison procedures—including in Florida, Georgia, New Hampshire, Indiana, North Carolina, North Dakota, and Illinois. *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019); *Fla. Democratic Party v. Detzner*, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, 2018 WL 7139247 (11th Cir. Dec. 11, 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018); *Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006); *Frederick v. Lawson*, 481 F. Supp. 3d 774 (S.D. Ind. 2020); *Self Advocacy Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039 (E.D. N.D. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158 (M.D. N.C. 2020); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990). Ignoring the above, SOS brings this appeal based upon jurisprudential and constitutional theories that were thoroughly

examined—and rejected—by the district court. This Court should also dismiss Movants' appeal.

Plaintiffs request this Court affirm the district court's order and remand for further proceedings on the remaining claims and relief.

## V.    STANDARD OF REVIEW

This Court reviews a district court's final conclusions of law *de novo* and permanent injunctive relief for abuse of discretion. *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774–75 (5th Cir. 2000). Permissive intervention denials are reviewed for abuse of discretion. Section I.

## VI.    ARGUMENT

### A. Plaintiffs Have Article III Standing

To establish Article III standing, a plaintiff must demonstrate they suffered an injury-in-fact that is "concrete, particularized, and actual or imminent," "the injury was caused by the defendant," and "the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S.Ct. 1615, 1618 (2020). After thoroughly reviewing the record, the district court determined Plaintiffs have standing. ROA.5476–95.

### 1. Plaintiffs Demonstrate An Injury-In-Fact

An injury-in-fact need only be "an identifiable trifle." *U.S. v. Students Challenging Regul. Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (Precedent allows "important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote,… a $5 fine and costs,… and a $1.50 poll tax"). Plaintiffs easily satisfy this requirement.

### i. Weisfeld

"An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). Meeting either standard satisfies the injury-in-fact requirement. Weisfeld meets both standards. The district court found Weisfeld applied for and submitted a mail-in ballot, complied with the Election Code, and was nonetheless disenfranchised. ROA.5469–70, 5478–82. It further found Weisfeld votes regularly, will mail-in vote in the future, and, thus, be subjected to the signature-comparison procedure; EVBB members rejected her ballot based on the natural way she signs; and elderly voters and voters with disabilities exhibit a greater range of natural signature variation than the norm. ROA.5469–70, 5478–

82, 5501 n.24, 5515, 5521. These and other factual findings show Weisfeld

suffers an injury-in-fact. Section III.B.2.i.

### a. Weisfeld Will Certainly Be Subjected To The Signature-Comparison Procedure Again

Weisfeld's injury is certainly impending. Similar to the plaintiffs in

*Raetzel*, Weisfeld

> alleg[es] a denial of basic tenets of procedural due process. This claim arises not from a denial of [her] right to vote, but from the apparent lack of notice and [an opportunity to cure] prior to [her] absentee vote[] being disqualified. [She] allege[s] [SOS is] responsible for the denial of these rights and seek[s] relief which would prevent a similar occurrence during a future election.

762 F. Supp. at 1355–56; *Carey v. Piphus*, 435 U.S. 247, 259 (1978)

(procedural due process protects persons from mistaken or unjustified

deprivation). Thus, Weisfeld suffers an injury-in-fact because her future

votes will undergo a signature-comparison procedure that lacks

constitutionally required procedural safeguards.

Subjection to the signature-comparison procedure also results in

Weisfeld suffering an injury-in-fact based on her equal protection claims.

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group,… [t]he "injury in fact" … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009); *Martin*, 341 F. Supp. 3d at 1333 n.5.

When subjected to the signature-comparison procedure, Weisfeld is treated differently than mail-in voters who are not elderly or disabled. Her signatures have a greater range of variation due to her age and disability, making signature reviewers looking for "same," "similar," or "match[ing]" signatures more likely to reject her ballot. *Id.*; *Jaeger*, 464 F. Supp. 3d at 1048; Section III.B; ROA.5479–82. Regardless of whether her ballots are rejected in the future, this barrier satisfies the injury-in-fact requirement. *City of Jacksonville, Fla.*, 508 U.S. at 666.

Weisfeld additionally suffers unequal treatment sufficient to satisfy the injury-in-fact requirement because she lacks the opportunity to cure signature-comparison rejections, while other Texas jurisdictions—like Brazos County—provide mail-in voters who forget to sign their ballots cure opportunities. *Martin*, 341 F. Supp. 3d at 1333 n.5 (individual plaintiffs had standing because they were not provided procedural safeguards by state's signature-comparison procedure whereas voters with other alleged defects on mail-in ballot materials were) (citation

omitted); ROA.2995–97, 5525–26; Tex. House of Representative Comm. on Elections, *supra* 1:41:08–1:41:56.

### b. Weisfeld Is At Substantial Risk Of Being Disenfranchised Again

Weisfeld is also at substantial risk of future disenfranchisement. Citing inapposite cases, SOS argues that "Weisfeld's injury … is no different than that of the members of the general public who may choose to use mail-in ballots." SOS Br. 26; *Hollingsworth v. Perry*, 570 U.S. 693, 705–08 (2013) (official proponents of proposition lost personal stake once it became law); *Carney v. Adams*, 141 S.Ct. 493, 501–02 (2010) (plaintiff failed to show he was "able and ready" to apply for judicial position state barred him from); *Stringer v. Whitley*, 942 F.3d 715, 722–23 (5th Cir. 2019) (no "plaintiff-specific evidence" showing future use of challenged particulars of voter registration system); ROA.5479.

In contrast, the district court made detailed findings that particularly Weisfeld faces substantial risk of future injury. ROA.5478–82; Sections III.B.2.i, VI.A.1.i. Further, the district court found that Weisfeld's ballot was rejected despite her being a former Hidalgo County EVBB member familiar with the signature-comparison procedure and despite her efforts to avoid a rejection. ROA.5480. Also, the signatures

that resulted in Weisfeld's improper rejection are now in her voter file, and future EVBBs and SVCs may review these rejected signatures for several years after Weisfeld wrote them, further increasing the already substantial risk of future improper rejection. Tex. Elec. Code §§ 87.041(e), 87.027(i); *Driehaus*, 573 U.S. at 164.

Claiming the district court applied the wrong test, SOS argues that Weisfeld's past injury "does not entitle her to future injunctive relief," and her threatened injury must be "certainly impending." SOS Br. 24–25. SOS implies that "certainly impending" and "substantial risk" have the same meaning, but are just stated differently. *Id.*

As an initial matter, Weisfeld faces certainly impending injuries as explained in Section VI.1.i.a. Further, the district court applied the "substantial risk" standard properly. ROA.5478–82. SOS ignores that the district court agreed that Weisfeld's prior rejection alone does not confer standing. ROA.5481 n.9. Weisfeld's past injury, while not determinative, is highly probative when viewed in light of other record evidence. *Driehaus*, 573 U.S. 158–64; *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). Thus, the district court explained that Weisfeld's past harm "merely

solidifies the [district court's] conclusion that Weisfeld faces a substantial risk of the improper rejection of her ballot in the future." ROA.5481 n.9.

SOS claims Weisfeld fails "to quantify the risk she faced" in order to demonstrate her "substantial risk" of future harm. SOS Br. 25–26. But the injury-in-fact requirement "is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Tex.*, 867 F.3d 604, 612 (5th Cir. 2017) (cleaned up). And Weisfeld is not required to show that her ballot would certainly be rejected in the future, a threshold that is impossible for any voter to meet and not required to show an injury-in-fact. ROA.5480–81.

Lastly, SOS incorrectly claims the expert "generally opined that individuals with certain physical conditions may have varying signatures." SOS Br. 26. The expert's unrebutted testimony states that "disabled writers," a group that includes Weisfeld, exhibit a greater range of signature variation. ROA.924, 981–82, 5501 n.24. The expert also testified that both physical and mental conditions affect signature variation. Section III.B.2.ii. Weisfeld suffers from both physical and mental conditions due to her traumatic brain injury. ROA.1070 (Weisfeld discussing going to specialized clinic for people with traumatic brain injuries for speech, occupational, and physical therapy); ROA.5479.

### ii. CTD

"[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999). If a defendant's actions perceptibly impair an organization in such a way, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In *OCA-Greater Houston*, this Court recognized organizational standing where a statute "'perceptibly impaired' [plaintiff organization] OCA's ability to 'get out the vote'" when OCA "went out of its way to counteract the effect of" the statute by "educat[ing] voters" on how to avoid being negatively impacted by it, even when the "injury was not large." 867 F.3d at 612.

Consequently, organizational standing does not require a diversion of significant resources, as SOS claims. *Id*; *Frederick*, 481 F. Supp. 3d at 790 (despite no "overwhelming" evidence, court held organization had standing because "it already has diverted and expects to continue in the future diverting their limited resources"); SOS Br. 27. Neither is CTD required to show a diversion of resources through budget transfers—the

injury-in-fact requirement is "qualitative, not quantitative in nature" *OCA-Greater Houston*, 867 F.3d at 612; SOS Br. 30. CTD is not required to show its members have had their ballot improperly rejected due to the signature-comparison procedure to show organizational standing, or show that it assisted a mail-in voter after a rejection, an infeasible option since voters have no power to cure their ballots after rejection. Section III.B.1.

CTD satisfies the injury-in-fact requirement. CTD's mission is frustrated by state laws that result in the improper rejection of mail-in ballots submitted by voters with disabilities, which undermine the very means of participation—voting—championed by CTD. ROA.1189–90, 1195–96, 2276–77, 5487–88.

The district court found that CTD specifically diverts resources— through text and video social media posts, reports, and in-person trainings—to warn mail-in voters about Texas' signature-comparison procedure and educate them on how to sign ABBMs, carrier envelopes, and other documents on file with local election officials in order to reduce the chance of improper rejection. ROA.2276–77, 5482–85, 5488 & n.13. Even SOS's Elections Division's Legal Director agrees that the type of

education CTD provides to voters with disabilities on writing signatures is helpful. ROA.2470 n.27.

SOS argues that CTD's activities are not an injury-in-fact because they are routine and would continue undisturbed regardless of whether the signature-comparison provisions were enjoined. SOS Br. 29; *but see Havens Realty Corp.*, 455 U.S. at 379 (defendant's actions "frustrated … [HOME's] efforts to assist equal access to housing through counseling and other referral services," requiring HOME to make duplicative efforts to "identify and counteract the defendant's" actions); Br. for Resp'ts at 35–36, *Havens Realty Corp.*, 455 U.S. 363 (1982) (No. 80-988) (discussing duplicative efforts).

SOS misconstrues the district court's findings. The district court found:

> [U]nrebutted testimony demonstrates that CTD would redirect certain resources to other projects in the event voters were no longer subjected to the challenged signature-comparison procedures.

ROA.5490, 5487; ROA.5485 ("CTD would be able to divert its focus to other issues if it did not have to 'find a way to cure … the signature issue.…'" "[T]he organization could 'move on to the next issue that we're dealing with, be it attendant wages, transportation, [or] education'").

Further misconstruing CTD's work, SOS incorrectly claims that CTD's education on writing signatures amounts to CTD advising voters on how to comport with the law. SOS Br. 30–31. But there is no law requiring voters to provide signatures that match exactly or even at all. SOS's dictates to SVCs in the Handbook regarding whether signatures "match" or are the "same" do not impose a legal requirement on voters. ROA.594, 596. CTD, instead, educates voters with disabilities on the best way to write signatures in order to help avoid the pitfalls of an error-prone signature-comparison procedure that disproportionately harms the disability community. ROA.5482–87, 5501 n.24; *Jaeger*, 464 F. Supp. 3d at 1048.

### 2. Plaintiffs Satisfy Causation And Redressability

Plaintiffs satisfy the causation and redressability requirements of standing because "the facial validity of a Texas election statute is, without question, fairly traceable to and redressable by … [SOS]." *OCA-Greater Houston*, 867 F.3d at 613.

This Court also held in *Texas Democratic Party v. Abbott* "that [SOS]'s duty to design the required [ABBM] that identifies voter-

eligibility categories" pursuant to Election Code Section 31.002(a) conferred standing because SOS

> would need to correct the form should the judiciary invalidate the age-based option. Thus, [SOS] had a role in causing the claimed injury and is in a position to redress it at least in part. That is enough to confer standing to the voter plaintiffs to sue [SOS].

978 F.3d 168, 178 (5th Cir. 2020).

So too here. SOS is Texas' chief election officer and has various duties to administer the Election Code. Tex. Elec. Code §§ 31.001–31.005. The Election Code requires SOS prescribe the design and content of all mail-in ballot forms, including the ABBM, the "Dear Voter" letter, and the rejection notice. *Id.* § 31.002. For example, the only time a local election official can use a rejection notice not created by SOS is if that form is SOS-approved or in an emergency. *Id.* § 31.002(d); ROA.2640–41, 2844–45.

If Plaintiffs are successful, either the signature-comparison procedure will be enjoined entirely or the procedure will require additional procedural safeguards. ROA.50–51. Either way, SOS would have to amend its mail-in ballot materials. *Abbott*, 978 F.3d at 178. The rejection notice could no longer include EVBB signature-comparison

determinations as a basis for rejection if the signature-comparison procedure is struck down entirely. ROA.2766. The "Dear Voter" letter's reference to the signature-comparison procedure would also require removal. ROA.5380. If the relief requires implementation of additional procedural safeguards, the rejection notice, ABBM, and/or any other mail-in voting forms must be updated by SOS to inform voters about these procedural safeguards. ROA.5561–63. Even assuming *arguendo* the rejection notice, which was updated during litigation to include instructions for voters to ask about remedies, somehow now provides sufficient safeguards—and it does not—"voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case[.]" *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953); ROA.2764–67.

SOS also helps cause Plaintiffs' injury by commanding SVC members through the Handbook that each must use their "best judgement" to determine if the signatures "match" or are the "same." ROA.594, 596. This command fails to take into account natural variations that can exist between signatures written by the same person, as explained by the expert and shown by Weisfeld's and Richardson's

experiences. Section III.B.2. The Handbook's command originates with SOS alone. ROA.594, 596. The Election Code only requires election officials "compare" signatures when making their determinations. Tex. Elec. Code §§ 87.027(i), 87.041(e), (f). If the signature-comparison procedure is struck down entirely, SOS's command would need to be removed from the Handbook. Also, as explained *infra*, SOS's advisories, other directives, and orders also help cause and can help redress Plaintiffs' injuries.

Finally, precedent holds that it makes no difference to SOS's traceability and redressability that local election officials could additionally provide Plaintiffs relief. ROA.5490–95; *OCA-Greater Houston*, 867 F.3d at 612–13.

## B. Sovereign Immunity Does Not Bar Plaintiffs' Claims

A state's protection from suit is "not absolute." *AT&T Comm'ns v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001). There is an exception to sovereign immunity when a suit against a state official alleges a constitutional violation and seeks prospective relief. *Ex parte Young*, 209 U.S. 123, 159–60 (1908). This exception applies here.

### 1. SOS Is Sufficiently Connected To Enforcement Of The Signature-Comparison Provisions

*Young* applies when defendants have "'some connection' to the state law's enforcement." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) (citing *Young*, 209 U.S. at 157.). Plaintiffs satisfy *Young*.

Plaintiffs also satisfy the heightened standard in *Abbott* because SOS has "particular dut[ies] to enforce the statute[s] in question and a demonstrated willingness to exercise [those duties]." *Abbott*, 978 F.3d at 179. *Abbott*'s standard originates from an aspect of *Okpalobi v. Foster* that "is not binding precedent" since that section of that *en banc* opinion "did not garner majority support." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (citing *Okpalobi*, 244 F.3d 405, 414 (5th Cir. 2001) (*en banc*)); *City of Austin v. Paxton*, 943 F.3d 993, 999–1000 (5th Cir. 2019). Regardless, *Abbott*'s standard is satisfied by the sufficient indicia of SOS's enforcement powers in Election Code Sections 31.001 to 31.005 as well as by SOS's enforcement actions, all discussed *supra* and below. Even a "scintilla of enforcement by the relevant state official with respect to the challenged law" will suffice. *Abbott*, 978 F.3d at 179.

*Abbott* also observed that, under *Young*, sufficient connection to a challenged law requires a "provision-by-provision analysis" showing an official's "requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Id.* SOS insists that *Abbott*'s "provision-by-provision analysis" requires Plaintiffs identify a reference to SOS's authority in each of the signature-comparison provisions Plaintiffs challenge. SOS Br. 15, 19–21. But SOS's duty to enforce a specific Election Code provision need not be explicitly stated in the challenged provision itself. *Paxton*, 943 F.3d at 997–98 (citing *Young*, 209 U.S. at 157). *Abbott* concluded that, while the plaintiffs in that case had challenged the Election Code's age-based mail-in voting provision (Section 82.003), SOS's duty to enforce that challenged provision was found under a separate provision (Section 31.002), which requires her to design and provide the ABBM to local officials. 978 F.3d at 179–180.

SOS meets these requirements with regard to the signature-comparison procedure. As explained *supra*, she is the state's chief elections officer, and the Election Code tasks her with duties to "prescribe the design and content" of forms necessary for the administration of the

state's election laws—including forms related to the signature-comparison procedure—that local election officials are required to use. Tex. Elec. Code §§ 31.001–31.002. SOS also must enforce and maintain uniformity as well as assist and advise in the application, operation, and interpretation of election laws, including the signature-comparison provisions. *Id.* §§ 31.003–31.005.

As explained *supra*, Section 31.002 requires SOS prescribe the design and content of the ABBM, all the mail-in ballot materials sent to voters apart from the ballot itself, and the rejection notice; and local election officials are required to use such forms outside of emergencies. Consequently, SOS has the "authority to compel or constrain local officials based on actions she takes" as to these forms. *Abbott*, 978 F.3d at 180. This is especially true for mail-in voting—and its signature-comparison procedure—because the process requires interaction between election officials and voters through forms sent via mail. The ABBM, "Dear Voter" letter, and the rejection notice in particular serve a crucial role in the signature-comparison procedure, and some or all will need to be updated by SOS if Plaintiffs prevail. *Id.*; Section VI.A.2.

SOS claims Plaintiffs' challenge of the signature-comparison provisions is similar to the challenge in *Mi Familia Vota v. Abbott* of the electronic-voting-equipment requirement for counties participating in the countywide polling program. SOS Br. 20–21 (citing 977 F.3d 461, 468 (5th Cir. 2020)). *Mi Familia Vota* is inapposite, since the plaintiffs in that case sued to allow countywide polling counties to use paper ballots. 977 F.3d at 465, 468. The Election Code tasks local election officials with preparing ballots whereas, here, it tasks SOS with creating forms related to the signature-comparison procedure. *Compare* Tex. Elec. Code § 31.002 *with* § 52.002.

SOS has also demonstrated a willingness to exercise her authority under Sections 31.001 and 31.003 to 31.005 to enforce the signature-comparison procedure. *Abbott,* 978 F.3d at 179. SOS has issued advisories, which local officials view as binding, and directives pursuant to these provisions—including during this litigation—commanding SVCs through the Handbook, requiring local election officials to use the updated rejection notice, and advising county officials to mail notices out "as soon as possible." ROA.594, 596, 2568–69, 2634, 2764–67, 5380, 5494, 5560 n.60; Section VI.A.2.

Thus, SOS is the chief election officer under Section 31.001 in far more than name-only. *OCA-Greater Houston,* 867 F.3d 613–14; *Paxton,* 943 F.3d at 1002. *Abbott* noted that SOS's title on its own may not satisfy the connection requirement in that case, but did not conclude that this statutory provision is irrelevant to the connection analysis. 978 F.3d at 179.

SOS claims her authority under Section 31.003 is "general" and compares that provision to *Abbott*'s analysis of the Attorney General's "duty to enforce and uphold the laws of Texas." SOS Br. 17 (quoting 978 F.3d at 181). *Abbott* did not make this comparison. *Abbott* noted that this Court "previously interpreted [Sections 31.003 and 31.004] as requiring [SOS] to take action with respect to elections" and that the Texas Supreme Court considered these provisions to cover some breakdowns in the election process, but not every breakdown. 978 F.3d at 180 (cleaned up).

SOS argues that "'the mere fact that' an official '*has* the authority to enforce'" the Election Code under Section 31.005 falls short of showing a sufficient connection. SOS Br. 17–18 (citing *Paxton,* 943 F.3d at 1001–02). But SOS's willingness to exercise her Section 31.005 authority to

enforce the state's mail-in ballot laws bespeaks the connection she now disclaims. As the district court found:

> [SOS]'s August 27, 2020 letter to Harris County [ordering the County to halt plans to send ABBMs to all its voters] indicates that [SOS] believes its office has a "sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions" … For that reason, [SOS]'s briefing strains credulity to the extent it asserts that [SOS] does not have a "sufficient connection to the enforcement" *of those same provisions…*

ROA.5497 n.22 (emphasis in original), 5493 n.19.

Finally, SOS has the requisite connection to the enforcement of Texas' signature-comparison provisions even if local election officials also have some connection to those laws. This is consistent with *Abbott*'s holding that a "division of responsibilities" with local officials does not obviate SOS's connection to the enforcement of Texas' election laws. 978 F.3d at 180; ROA.5498–99.

## 2. *Young* Does Not Prevent The District Court From Requiring SOS To Notify Local Officials

SOS insists that *Young* bars relief requiring a government official to take "affirmative acts." SOS Br. 21. This argument lacks support under applicable law. SOS relies on footnote 11 of *Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682, 691 n.11 (1949). But her analysis

of *Larson* and its progeny is erroneous. This Court rejected SOS's interpretation of *Larson*'s footnote 11 in *Saine v. Hospital Authority of Hall County*, holding, consistent with other circuits, that it "does not bar all actions seeking affirmative action by governmental officials." 502 F.2d 1033, 1036–37 (5th Cir. 1974); *Vann v. Kempthorne*, 534 F.3d 741, 754 (D.C. Cir. 2008). Affirmative injunctions are permissible unless they "would work an intolerable burden on governmental functions, outweighing any consideration of private harm" *Saine*, 502 F.2d at 1037.

Federal court relief compelling affirmative acts by state officials is common. *Quern v. Jordan*, 440 U.S. 332, 347–49 (1979); *Milliken v. Bradley*, 433 U.S. 267, 288–90 (1977); *Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380, 387–88 (5th Cir. 2014); *OCA-Greater Houston v. Tex.*, 2018 WL 2224082, at *5 (W.D. Tex. May 15, 2018) (ordering SOS to "distribute notice to all county elections departments clarifying that they are not to enforce [federally preempted Election Code provision]" and to "explicitly explain" correct rules); *Lee*, 915 F.3d at 1317.

SOS argues that the district court's injunctive relief impermissibly controls her discretion. SOS Br. 22. SOS's argument misunderstands the

purpose of the *Young* exception. SOS does not have discretion to continue unconstitutional enforcement, including in connection with the signature-comparison provisions. *Young*, 209 U.S. at 159.

SOS specifically claims that the district court's injunctive relief requiring her to issue advisories is improper. SOS Br. 22. SOS argues she has the discretion to determine how to implement Sections 31.003 and 31.004, including the "content and timing" of advice to local officials. *Id*. The plain language of these provisions does not grant her any such discretion. If the signature-comparison provisions are struck down, the forms, advisories, and directives SOS has issued related to the signature-comparison provisions would require update for SOS to avoid enforcing an unconstitutional law. *Young*, 209 U.S. at 159. SOS lacks the authority to choose when and how to comply with such a ruling. *Id*.

SOS points to the presence of the word "may" in Section 31.005 to argue the district court cannot require SOS to order local officials to correct offending conduct. SOS Br. 23. Similar to issuing advisories, notifying violating local officials of offending conduct does not impose an intolerable burden on SOS's functions, especially because election officials are unlikely to reject SOS's court-ordered notifications. *Saine*,

502 F.2d at 1037; ROA.5494, 5560 n.60. These notifications, if any, would also not outweigh the harm of disenfranchisement. *Id.* Additionally, as discussed *supra*, SOS has demonstrated a willingness to enforce Section 31.005 with regard to the mail-in ballot process. And the district court's injunctive relief related to Section 31.005 only requires SOS remedy an unconstitutional procedure she has directed, advised, and assisted local officials with. *Young*, 209 U.S. at 159.

Finally, SOS's invocation of *Mi Familia Vota* is inapt because notifying local officials of court rulings is not the same as promulgating "regulations or legislation." 977 F.3d at 469; SOS Br. 23–24.

### C. Texas' Signature-Comparison Procedure Is Unconstitutional

#### 1. SOS Violates The Equal Protection Clause And The Signature-Comparison Procedure Causes An Undue Burden On The Right To Vote

The district court's ruling on Plaintiffs' Equal Protection Clause/undue burden on the right to vote claims was based on detailed factual findings and straightforward application of precedent. ROA.5532–41. Plaintiffs brought facial and as-applied challenges for all their constitutional claims.

The parties agree that the *Anderson-Burdick* test is applicable to Plaintiffs' equal protection claims. ROA.5532. Under *Anderson-Burdick*,

> [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."
>
> *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). This "flexible standard" differs from

the tiered scrutiny analysis found in traditional equal protection or substantive due process cases. *Burdick*, 504 U.S. at 433–434. However slight a burden may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.). Key to this balancing test is properly identifying (1) the injury, and (2) the particular state interest and the necessity of the burden.

### i. Plaintiffs And Other Mail-In Voters Suffer A Severe Burden On Their Right To Vote

SOS's *Anderson-Burdick* analysis relies on a misidentified injury: "the burden of providing similar signatures on an application and envelope." SOS Br. 44. However, under *Anderson-Burdick*, the relevant

burden is measured by "the character and magnitude of the asserted injury." *Anderson*, 460 U.S. at 789. Plaintiffs' injury is the improper rejection of mail-in ballots based on arbitrary, un-appealable, discriminatory, and error-prone signature-comparison determinations, which cause disenfranchisement. As the district court found:

> The undisputed record in this case … shows that qualified, registered voters have had their mail-in ballots improperly discarded—and have suffered disenfranchisement—as a result of the State's existing procedures.

ROA.5534. The asserted injury is not the physical burden of signing names similarly, which the Election Code does not even require. Neither is Texas' signature requirement for ABBMs and carrier envelopes being challenged, a requirement the district court did not enjoin.

The Supreme Court has "repeatedly recognized that all qualified voters have a constitutionally protected right … to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554–55 (1964) (citations omitted). Similar to courts across the country, the district court held that Texas' signature-comparison procedure, which results in mass un-appealable disenfranchisement, severely burdens the right to vote. *Lee*, 915 F.3d at 1321; *Frederick*, 481 F. Supp. 3d at 798; *Detzner*, 2016 WL 6090943, at *6 n.11 (characterizing "Florida's [signature-comparison]

scheme a severe burden on the right to vote" that "affects enough votes to change the election results and, by extension, our country's future."); *see also League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many").

The district court found that the signature-comparison procedure produces arbitrary and error-prone determinations. ROA.5511–16. It also found that the procedure discriminates against elderly people and people with disabilities—two of the four groups eligible for mail-in voting—who are more likely to have their mail-in ballots rejected due to a greater range of natural signature variation. ROA.5515. The district court further found that the procedure provides voters no personal option to appeal an improper decision. ROA.5516–23; Section VI.C.2.iii.

SOS claims that the witness signature requirement alleviates the burden placed on mail-in voters. SOS Br. 44. However, a witness can only sign for a mail-in voter if the voter "cannot do so because of a physical disability or illiteracy." Tex. Elec. Code § 1.011(a). Many voters eligible for a mail-in ballot due to a disability—like Weisfeld—are not eligible to use a witness because they can sign their names. ROA.5521

### ii. There Is No Sufficient Justification For The Burden Imposed On Plaintiffs And Other Mail-in Voters

This severe restriction only survives under *Anderson-Burdick* if it has been "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed,* 502 U.S. 279, 289 (1992). SOS does not characterize Texas' signature-comparison procedure as narrowly tailored, nor would the record support such a characterization. Moreover, *Anderson-Burdick* requires that even a minimal burden must be weighed against "the precise interests put forward by the State," and why "those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. SOS fails to provide any such justification.

In support of Texas' signature-comparison procedure, SOS offers only the conclusory assertion that "[r]equiring a voter's signature on his [ABBM] to match his signature on the carrier envelope deters fraud, promotes electoral integrity, and justifies the minimal burden imposed." SOS Br. 45. However, in applying *Anderson-Burdick*, the Court must not only determine the "legitimacy and strength" of the "precise interests put forward by the State as justifications[,]" it also "must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. SOS adds no elaboration to her claim,

forgoing the precision *Anderson-Burdick* requires. She similarly forgoes explaining why the signature-comparison procedure's absence of procedural safeguards is "necessary" to promote her stated interests. *Id.*

This disengagement is unsurprising given the record evidence. As explained, the signature-comparison procedure fails to deter fraud because it is a poor proxy for identity verification. Section III.B.2. And, "[i]f anything, the record makes clear that the implementation of additional procedural protections would actually *further* the State's asserted interests." ROA.5539–40 (emphasis in original)

> (public confidence in the integrity of elections is also furthered by providing voters an opportunity to cure errors that result from the currently opaque, unreviewable process.)

(cleaned up).

Failing to offer any particularized interests served by the current statutory scheme, SOS, citing to *Crawford*, hides behind an assertion that "[t]he district court erroneously faulted [SOS] for not producing specific evidence of fraud." SOS Br. 45. This is incorrect—the district court stated that:

> there is no requirement that [SOS] necessarily demonstrate past instances of voter fraud in order to have an interest in preventing voter fraud in the future, and the Court's holdings in this case do not turn on the absence of such evidence.

ROA.5538 n.44.

*Crawford* stands in support of the exact analysis SOS would have this Court eschew. *Crawford* upheld an Indiana law requiring that voters present government-issued photo identification. 553 U.S. at 203–04. Rather than accepting a generalized list of purported justifications, as SOS proposes here*, Crawford* carefully scrutinized the state's asserted interests of improving and modernizing election procedures and deterring voter fraud. *Id.* at 191–97. Key to *Crawford*'s reasoning was *Anderson-Burdick*'s requirement of "precise interests" which "make it necessary to burden the plaintiff's rights." *Id. Crawford* gave significant weight to record evidence showing that Indiana's lists of registered voters "included the names of thousands of persons who had either moved, died, or were not eligible to vote because they had been convicted of felonies." *Id.* at 196. In other words, the Court looked to concrete, identified problems and a legislative response tailored to target them.

SOS further ignores that the burden presented by the *Crawford* plaintiffs was not disenfranchisement, but the logistical hurdle of acquiring photo identification. Under the challenged Indiana law, even "voters without photo identification may cast provisional ballots that will

ultimately be counted," if the voter took certain enumerated steps after the election. *Id.* at 199. Plaintiffs seek the same type of safeguard: a cure opportunity for eligible voters who will otherwise be disenfranchised by Texas' signature-comparison procedure.

As the district court concluded, and in contrast to the circumstances in *Crawford*, it is impossible for Texas mail-in voters to ensure their votes are counted:

> [T]he record demonstrates that ballots are improperly rejected based on perceived signature mismatches *even when* voters are fully informed of the requirements and attempt to comply.

ROA.5513 n.29 (emphasis in original). Once a mail-in ballot is rejected, voters cannot cast a ballot in-person or submit another mail-in ballot without committing a crime; and requesting the EVC challenge a rejection in court is unavailable. Section III.B.1.

SOS ignores that the signature-comparison procedure results in error-prone and inconsistent determinations, as the district court found. ROA.5511–16. As the Supreme Court has explained, the "arbitrary and disparate treatment" of ballots—caused by a process without "sufficient guarantees of equal treatment" or "minimal procedural safeguards"—is forbidden by the Equal Protection Clause. *Bush v. Gore*, 531 U.S. 98, 104–

09 (2000). Consistent with the record here—where "under [Texas's] existing policies … whether a ballot is accepted or rejected very well may vary depending on which members of the review committee conduct the comparison,"—a particular concern arises when "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county." ROA.5468; *Bush*, 531 U.S. at 106. Quite simply, a voting regulation is unconstitutional "in the absence of specific standards to ensure its equal application." *Bush*, 531 U.S. at 106. Texas' signature-comparison procedure contains no specific standards, and, without meaningful procedural safeguards, has and will continue to cause the erroneous disenfranchisement of Texas voters.

### 2. SOS Violates Procedural Due Process

#### i. The Right To Vote Is A Liberty And Property Interest

The right to vote, specifically to have a duly-cast mail-in ballot counted, is a liberty and property interest inherent within the Fourteenth Amendment's Due Process Clause. In the alternative, this right is a state-created liberty and property interest protected by the Due Process Clause.

### a. The Right To Vote Is A Liberty Interest Inherent Within the Due Process Clause

The Supreme Court requires an interest be "fundamental to our scheme of ordered liberty" or "deeply rooted in this Nation's history and tradition" to be considered a liberty interest inherent within the Constitution. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 754 (2010) (plurality op.) (cleaned up); *Timbs v. Indiana*, 139 S.Ct. 682, 686–87 (2019). "History and tradition guide and discipline this inquiry but do not set its outer boundaries." *Obergefell v. Hodges*, 576 U.S. 644, 664 (2015). The Due Process Clause is not restricted "to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 669 (1966). Rather, the Supreme Court's method respects "history and learns from it without allowing the past alone to rule the present." *Obergefell*, 576 U.S. at 664. This analysis requires courts to interpret the meaning of liberty broadly. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972).

Notwithstanding SOS's claims to the contrary, the founders of this country and courts throughout history have considered the right to vote a liberty interest. In *United States v. Haymond*, the Supreme Court stated:

> Together with the right to vote, those who wrote our Constitution considered the right to trial by jury "the heart and lungs, the mainspring and the center wheel" of our liberties, without which "the body must die; the watch must run down; the government must become arbitrary." Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed. 1977).

139 S.Ct. 2369, 2375 (2019) (plurality op.); *see also U.S. v. State of Tex.*, 252 F. Supp. 234, 250 (W.D. Tex. 1966) ("it cannot be doubted that the right to vote is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause") *summarily aff'd*, 384 U.S. 155 (1966). This Court has explicitly considered the right to vote a liberty interest. *Arnaud v. Odom*, 870 F.2d 304, 311 (5th Cir. 1989); *Sotto v. Wainwright*, 601 F.2d 184, 191 (5th Cir. 1979); *Duncan v. Poythress*, 657 F.2d 691, 705 (5th Cir. B 1981).

Legal traditions reaching back before the founding of the United States also characterize the right to vote as a liberty. The landmark dissent by Chief Justice Lord Holt in the English case *Ashby v. White* left an indelible influence on American jurisprudence. In his dissent, later upheld by the House of Lords, Lord Holt considered, pursuant to the franchise-granting laws of the time, that the "inhabitants of the County Palatine of Durham" had a "liberty and privilege of electing and sending

any knights and burgesses to the High Court of Parliament." John William Smith, et al., *A Selection of Leading Cases on Various Branches of the Law* 355 (Vol. 1, 1855); *Ashby v. White*, 2 Ld Raym 938, 953–958 (1702).

> Lord Holt also stated:

> A right that a man has to give his vote at the election of a person to represent him in parliament, there to concur to the making of laws, which are to bind his liberty and property, is a most transcendent thing, and of an high nature. It is a great injury to deprive him of it.

*Gray v. Sanders*, 372 U.S. 368, 375 n.7 (1963) (cleaned up) (quoting *Ashby*, 2 Ld.Raym. at 938, 953, 954, 956). American courts hold the right to vote in similar regard:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964); *Harper*, 383 U.S. at 667; *Reynolds*, 377 U.S. at 561–62.

Additionally, the right to vote is embedded within parts of the Constitution applicable to the states. The right to vote in federal elections is conferred by Article I, Section 2, and this provision secures that right against the actions of states. *Harper*, 383 U.S. at 665; *U.S. v. Classic*, 313

U.S. 299, 315 (1941). The right to vote in both federal and state elections is also found within the First and Fourteenth Amendments. *Burdick*, 504 U.S. at 441–42; *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

Based on the principles above, this Court applies substantive and procedural due process analysis to voting claims. *Duncan*, 657 F.2d at 703–05; *Williams v. Taylor*, 677 F.2d 510, 514–15 (5th Cir. 1982); *U.S. v. Atkins*, 323 F.2d 733, 743 (5th Cir. 1963); *see also Cook v. Randolph County, Ga.*, 573 F.3d 1143, 1152 (11th Cir. 2009).

SOS cites *League of Women Voters of Ohio v. Brunner*, an inapposite case, and *Memphis A. Phillip Randolph Institute v. Hargett*, a non-precedential stay decision relying solely on *Brunner*, to claim the right to vote is not a liberty interest. SOS Br. 35; *Brunner*, 548 F.3d 463, 478–79 (6th Cir. 2008); *Hargett*, 482 F. Supp. 3d 673, 681, 688 (M.D. Tenn. 2020) (*Hargett* is also factually distinguishable because in Tennessee a mail-in voter who receives a signature-comparison rejection can submit another mail-in ballot or vote provisionally in-person, whereas SOS considers these acts criminal). *Brunner* did not hold that the right to vote is not a liberty interest, which would conflict not only with established caselaw, but with *Brunner* itself. Rather, *Brunner* ruled that the plaintiffs in the

case did not allege a constitutionally-protected interest in their procedural due process claim, and, in the same decision, ruled in favor of plaintiffs on their substantive due process claim. 548 F.3d at 478–79. Since all liberty interests under substantive due process also apply under procedural due process, *Brunner* cannot stand for the proposition that the right to vote is not a liberty interest. *Toney-El v. Franzen*, 777 F.2d 1224, 1227 (7th Cir. 1985); Erwin Chemerinsky, Substantive Due Process, 15 Touro L. Rev. 1501, 1501–02 (1999). *Brunner* actually rejected the procedural due process claim because the *Brunner* plaintiffs failed to make a developed argument distinct from their substantive due process claim. 548 F.3d at 479. SOS and *Hargett*, therefore, misinterpret *Brunner*'s holding on procedural due process.

SOS also mischaracterizes Plaintiffs' interest as "the right to vote by mail." SOS Br. 32–35. This is misleading. Plaintiffs' liberty interests arise from the right to vote, specifically the right to have their votes counted, the deprivation of which without procedural safeguards creates their procedural due process claim. Once the state allows mail-in voting, it must naturally ensure that ballots cast by qualified voters are counted

properly in order to avoid deprivation. *Reynolds*, 377 U.S. at 554–55; *Classic*, 313 U.S. at 315.

SOS further claims that Plaintiffs' interest arises from a state-created process that expands the right to vote, and, thereby, is not a liberty interest. SOS Br. 34–35. But almost all deprivations of the right to vote after a qualified voter casts a ballot arise from state-created processes since states administer elections under the "Times, Places and Manner" Clause. U.S. Const. Art. I § 4, cl. 1. And "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of … the right to vote[.]" *Tashjian v. Republican Party of Connecticut*, 479 U.S. at 208, 217 (1986).

SOS attempts to link Plaintiffs' procedural due process claims with *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). SOS Br. 33–35. That case considered whether jailed voters were constitutionally eligible for mail-in voting. *McDonald*, 394 U.S. at 803. Unlike *McDonald*, Plaintiffs' case does not concern eligibility. Weisfeld and the mail-in voters CTD serves are already eligible mail-in voters. Section III.B.2.i. The injury at issue here is whether qualified mail-in voters are unconstitutionally deprived of their right to vote by improper

rejections of their mail-in ballots due to final signature-comparison determinations. Also unlike *McDonald*, once a mail-in ballot is rejected, the voter has no option to cure their ballot or submit another ballot. Section III.B.1; *McDonald*, 394 U.S. at 807–08.

### b. The Right To Vote Is A Property Interest Inherent Within The Due Process Clause

In *Carey*, the Supreme Court noted that the deprivation of the right to vote can result in "the award of substantial damages." 435 U.S. at 264 n.22. SOS claims that Plaintiffs do not assert this interest because they only include "liberty" when they quote the Due Process Clause in their Complaint. SOS Br. 33 n.10. Plaintiffs allege deprivations of the right to vote in their Complaint and base their arguments throughout the lawsuit on this right. Since the deprivation of that right always implicates both liberty and property interests, Plaintiffs establish such interests. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

### c. The Due Process Clause Protects State-Created Interests Involving The Right To Vote

Even if the Court finds Plaintiffs' interest is not a liberty or property interest inherent within the Due Process Clause, it is, at the very least, a state-created liberty and property interest that requires protection under the Due Process Clause. "[O]nce the state creates a

[mail-in] voting regime, they must administer it in accordance with the Constitution." *Martin*, 341 F. Supp. 3d at 1338 (cleaned up). "Having created a [mail-in voting] regime through which qualified voters can exercise their fundamental right to vote," SOS "must now provide [mail-in] voters with constitutionally adequate due process protection." *Id*.

SOS claims that state-created liberty interests are "generally limited to freedom from restraint" and that mail-in voting does not apply. SOS Br. 34. SOS is incorrect. Freedom from restraint is not limited to physical restraint, can include freedom from the termination of important rights triggered by state-created entitlements, and specifically includes freedom from disenfranchisement. *Goldberg v. Kelly*, 397 U.S. 254, 261–62 (1970); *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Taylor v. Beckham*, 178 U.S. 548, 603 (1900) (Harlan, J. dissenting) (citing *Minor v. Happersett*, 88 U.S. 162, 176 (1874)). Even cases that conflict with precedent on the right to vote hold that, once a state grants the right to vote, it cannot deprive it without due process of law. *Minor*, 88 U.S. at 176 ("The right of suffrage, when granted, will be protected. He who has it can only be deprived of it by due process of law, but in order to claim protection he must first show that he has the right.").

Here, Texas grants specific groups the ability to mail-in vote. Once a mail-in voter submits a ballot, which the EVC provides after accepting their ABBM, that voter is accorded due process protections from the deprivation of their right to vote, especially since they have no method to cure or cast a ballot that counts if their mail-in ballot is rejected. Section III.B.1.

SOS also relies on *Johnson v. Hood*, but that case involved no claims that election laws were unconstitutional or illegal under federal law, or that election procedures were inadequate. 430 F.2d 610, 611 (5th Cir. 1970); *Duncan*, 657 F.2d at 704.

### ii. *Mathews v. Eldridge* Provides The Proper Test For Procedural Due Process Claims

A deprivation or risk of deprivation of the right to vote through adjudicative actions without constitutional procedural safeguards triggers procedural due process protections. *Jones v. Governor of Florida*, 975 F.3d 1016, 1048 (11th Cir. 2020); *Atkins*, 323 F.2d at 743 (holding "the Board could not deprive a person of the right to register to vote on the basis of secret evidence without affording notice and an opportunity for hearing.").

Signature-comparison determinations are adjudicative actions. Section III.B.1. Adjudicative actions, as opposed to legislative actions, are "those that concern a 'relatively small number of persons' who are 'exceptionally affected, in each case upon individual grounds,' by the state action." *Jones*, 975 F.3d at 1048 (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915)). Legislative actions involve "general laws that apply 'to more than a few people.'" *Id.*

"[T]o determine the process due for adjudicative deprivations, courts [including this Court] apply the familiar balancing test of *Mathews v. Eldridge*," 424 U.S. 319 (1976). *Jones*, 975 F.3d at 1048; *Wilson v. Birnberg*, 667 F.3d 591, 601-02 (5th Cir. 2012); *Taylor*, 677 F.2d at 514–15. The *Mathews* test is specifically purposed to protect "the essence of due process," which requires "that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." *Mathews*, 424 U.S. at 348–49 (cleaned up).

Despite the fact that *Mathews'* specialized test directly governs Plaintiffs' procedural due process claims, SOS argues that the *Anderson-Burdick* test applies to all procedural due process claims in the voting context. SOS Br. 36–39. However, the *Anderson-Burdick* test is rooted in

Equal Protection Clause caselaw that analyzed non-adjudicative restrictions and burdens on the right to vote. *Anderson*, 460 U.S. at 786 n.7.

Consequently, *Anderson-Burdick* lacks the framework required to assess procedural due process claims. For example, whether a restriction is "nondiscriminatory" generally can greatly affect the outcome of an *Anderson-Burdick* claim. *Burdick*, 504 U.S. at 434. In contrast, under *Mathews*, facts proving discriminatory treatment can strengthen a plaintiff's claim, but the fact that a challenged procedure is nondiscriminatory has no effect on whether procedural due process was violated. *Id.*; *Mathews*, 424 U.S. at 335; *see, e.g., Goldberg*, 397 U.S. at 268–71.

SOS fails to cite any procedural due process cases that apply *Anderson-Burdick*. In contrast, two Fifth Circuit cases apply *Mathews* to procedural due process allegations involving the deprivation of the right to vote, including a case decided after *Anderson* and *Burdick* were decided. *Wilson*, 667 F.3d at 601–02; *Taylor*, 677 F.2d at 514–15; *see also Jones*, 975 F.3d at 1048–49. The Ninth Circuit case SOS claims applied "due-process challenges to voting laws" under *Anderson-Burdick* did not

discuss procedural due process, and the appellees only briefed equal protection claims on appeal. SOS Br. 37; *Weber v. Shelley*, 347 F.3d 1101, 1105–06 (9th Cir. 2003); Br. for Appellees at 22–27, *Weber v. Shelley*, 347 F.3d 1101 (9th Cir. 2003) (No. 02–56726). The remaining cases SOS cites involve legislative restrictions on the right to vote and/or other rights, not adjudicative deprivations of the right to vote. SOS Br. 35–39; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358–59 (1997) ("That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights"); *Tashjian*, 479 U.S. at 213–14 (concerning political party's claim, based on associational rights, that election law prohibiting open primary elections is unconstitutional); *Crawford*, 553 U.S. at 199 (concerning voter identification requirements that burdened voters but did not disenfranchise them); *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182-87 (5th Cir. 1996) (concerning political party's and its members' challenge of Texas' minority party deadlines and candidate petition requirement to collect voter identifier numbers); *Caruso v. Yamhill County ex rel. County Comm'r*, 422 F.3d 848, 855, 862–64 (9th Cir. 2005) (petition circulator claiming an election law that requires the title of an initiative on a ballot

to include a warning violated his free speech and substantive due process rights).

Therefore, *Mathews* is the proper test to apply to Plaintiffs' procedural due process claims. If the Court ultimately determines that *Anderson-Burdick* applies to Plaintiffs' procedural due process claims, it should conduct its *Anderson-Burdick* analysis relying on procedural due process cases, including the ones provided in this brief, since procedural due process precedent is relatively distinct from the traditional equal protection precedent *Anderson-Burdick* relies on. *Anderson*, 460 U.S. at 786 n.7.

### iii. SOS Violates Procedural Due Process Under *Mathews*

*Mathews* instructs courts to balance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. The district court did not err in finding that Plaintiffs succeed under *Mathews*.

**Private interest**—"The right to be heard before being condemned to suffer grievous loss of any kind … is a principle basic to our society." *Id.* at 333 (cleaned up). The private interest here is the right to vote, a liberty and property interest protected by the Due Process Clause. Section VI.C.2.i. Other courts evaluating mail-in ballot signature-comparison laws on procedural due process grounds accorded this factor significant weight. *See, e.g., Saucedo*, 335 F. Supp. 3d at 217. Because rejecting ballots through the signature-comparison procedure results in the complete deprivation of the right to vote, this factor weighs heavily in Plaintiffs' favor.

**Risk of erroneous deprivation and probable value of procedural remedies**—The risk of erroneous deprivation under the current signature-comparison procedure is great. Both Weisfeld's and Richardson's experiences with the flawed procedure prove voters are at the mercy of EVBBs. Section III.B.2.i; ROA.5515–16. Texas counties discarded at least 1,873 mail-in ballots during the 2018 General Election and at least 1,567 during the 2016 General Election solely based on signature-comparison rejections. ROA.5399 n.24, 2499–2507, 989–91. Thousands of votes thrown out without meaningful procedural

safeguards every major election is not a rare occurrence. Even SOS acknowledged that the existing signature-comparison procedures may result in certain mail-in ballots being improperly rejected. ROA.5469.

"Central to the evaluation of any administrative process is the nature of the relevant inquiry." *Mathews*, 424 U.S. at 343. *Atkins* held that the process used by the Dallas County Board of Registrars to adjudicate voters' qualifications—including the "ability to read and write any article of the Constitution, good character, and embrac[ing] the duties and obligations of citizenship" among other qualifications— through voter registration applications, accompanying questionnaires, and oral questions violated procedural due process. 323 F.2d at 741–43. In its analysis, *Atkins* pointed to a district court holding affirmed by the Supreme Court, which concluded

> that the words "understand and explain"—[in a provision only granting voter registration to applicants who can understand and explain any article of the Constitution]—did not provide a reasonable standard and gave the [Board of] Registrars [in the case] the arbitrary power to accept or reject any prospective elector who applied.

*Id*. at 742 (quoting *Davis v. Schnell*, 81 F. Supp. 872, 877 (S.D. Ala. 1949), *aff'd per curiam*, 336 U.S. 933 (1949)). Relying on *Davis*' analysis, *Atkins* found that, when considering whether to accept a voter registration

application, the Dallas County Board of Registrars lacked "any standards by which it may determine what is a correct answer." *Atkins*, 323 F.2d at 743. *Atkins* also noted that

> standards must be such as to furnish a rejected applicant a definite basis upon which to seek proper judicial review of the Board's action, and must furnish reviewing courts something definite to act upon in ascertaining whether he had been arbitrarily or unjustly denied the right of suffrage.

*Id.* at 742.

The only instruction specific to the method of analyzing signatures under the signature-comparison procedure in the Election Code is to "compare" the signatures with each other, and the only additional instruction—given by SOS—is for SVCs to use their "best judgment" to determine whether signatures "match" or are the "same." ROA.594–96. Both instructions utilize "ambiguous," "uncertain," and "indefinite" terms like "compare," "match," and "same," creating an effectively meaningless signature-comparison method, which ultimately gives EVBBs and SVCs arbitrary power to accept or reject any mail-in ballot. *Davis*, 81 F. Supp. at 877–78; *Atkins*, 323 F.2d at 741–43. Richardson's experience serves as an example: when he confronted Brazos County

about his rejected ballot, he was told the EVBB "eye ball[ed]" his signature. ROA.1028.

Given the lay status of signature reviewers; the greater range of signature variation among elderly voters and voters with disabilities, who are a large subset of those qualified for mail-in voting; and a system devoid of expert training and functional standards, the risk of erroneous deprivation is great. *Atkins*, 323 F.2d at 741–43; Section III.B.

SOS claims that signature comparisons by layperson EVBBs and SVCs are acceptable because jurors are frequently tasked with comparing signatures in trials. SOS Br. 40. However, unlike EVBBs and SVCs, jurors are provided unlimited time to review such signatures and must consider all other evidence offered by parties while deliberating. Section III.B. Thus, the three cases SOS cites in support of her argument are inapposite. *U.S. v. Ismoila*, 100 F.3d 380, 387–89 (5th Cir. 1996) (jurors also considered eye witness testimony and documentary evidence); *United States v. Cashio*, 420 F.2d 1132, 1135 (5th Cir. 1969) (statutory rebuttable presumption rule bolstered claim that signatures on fraudulent income tax returns were defendants'); *Strauss v. United*

*States*, 311 F.2d 926, 932 (5th Cir. 1963) (jurors also provided expert testimony and other evidence for consideration).

Thankfully, the probable value of procedural remedies in this case is high. *Atkins*, 323 F.2d at 743, 745. A variety of different notice and cure options exist, including the safeguards the district court will consider for additional relief, the district court's partial permanent relief, the options Plaintiffs proposed to the district court, and procedures implemented by several other states. ROA.5523–26. Implementation of any of these procedures would have protected Weisfeld and Richardson from disenfranchisement. ROA.5523 (both "state that they would have taken steps to correct any mistake had they been notified of the signature-mismatch prior to their ballots' official rejections"); ROA.1081–82, 1027–28. Given that a large number of voters will attempt to mail-in vote in coming elections, disproportionately those who are elderly or people with disabilities, the positive impact of such change is significant.

**Government interest**—Consideration of the final *Mathews* factor weighs in Plaintiffs' favor, as their requested improvements to the signature-comparison procedure would actually enhance the government's interests. ROA.5528–29.

SOS concedes that Plaintiffs' requested relief would not impose a significant burden on her under normal circumstances. ROA.5563. SOS does not claim she would suffer a fiscal or administrative burden from the district court's injunction. SOS Br. 41–42. She, instead, makes conclusory claims that the district court fails to explain how its injunction or any proposed relief would work, and that this relief fails to cover all mail-in voters and guarantee their votes will be counted. *Id.* As an initial matter, "[t]he relief sought needn't completely cure the injury … it's enough if the desired relief would lessen it." *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Further, the district court explained in detail how its partial relief would function and also reserved deliberation of additional relief for later, after a hearing. ROA.5564–67.

The district court's partial relief will not be burdensome to the local defendants. ROA.5529. Although the statewide number of ballot rejections is in the thousands during major elections, the number from county to county is low. ROA.5530–31. Local election officials are already regularly in contact—via mail, email, text, phone, facsimile, or in-person—with mail-in voters, and provide similar identification and

curing schemes. ROA.515–16, 651, 654–56, 675–76, 714–716, 727–35, 5528–31; 52 U.S.C. § 21083(b)(2)(A).

## D. The District Court's Injunction Was Proper

SOS argues that the district court's injunctive relief exceeds the district court's authority and does not meet this Court's preliminary-injunction factors, SOS Br. 46–48. These arguments lack merit.

SOS improperly characterizes the district court's order as a preliminary injunction and, in doing so, applies the wrong test. The district court was clear that its order constituted final judgment as to some of Weisfeld and CTD's claims, and ordered permanent injunctive relief to remedy those claims. ROA.5542. The fact that the injunctive relief is partial—pending a hearing after which the district court will evaluate "whether additional injunctive relief is appropriate"—does not transform this permanent injunction into a preliminary one. ROA.5566–67.

Plaintiffs satisfy the permanent injunctive relief factors. Weisfeld suffers irreparable harm from the signature-comparison procedure. Sections VI.A.1, VI.C. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citation omitted). CTD also suffers irreparable harm because the signature-comparison procedure frustrates its mission to champion voting and protect the voting rights of Texans with disabilities. Section VI.A.1.ii; *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

The district court's relief solely addresses the challenged and unconstitutional signature-comparison procedure. ROA.50–51; *OCA-Greater Houston v. Tex.*, 2018 WL 2224082 at *1–5. Statewide relief is additionally appropriate because CTD serves Texans with disabilities throughout the state. ROA.1189; Section VI.A.1.ii.

By contrast, SOS faces minimal burden from the injunction. ROA.5563. It only requires SOS to issue two advisories and, then, possibly an additional notification to violating counties. ROA.5564–67. SOS's simple requirement does not outweigh the irreparable harm Plaintiffs face. *Jacobson v. Florida Secretary of State* is inapposite because, unlike here, that injunction enjoined non-parties and ordered the defendant to not permit enforcement of the challenged statute. 974 F.3d 1236, 1244, 1258 (11th Cir. 2020).

For the reasons above, public interest is served by allowing the district court's injunction to issue. *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014). SOS's argument that her interest in enforcing Texas' election laws merge with the public's interest is unavailing here, because the public interest cannot be served by enforcing an unconstitutional law. *Id.*; ROA.5544.

## E. The District Court Did Not Clearly Abuse Its Discretion By Denying Movants-Appellants' Motion To Intervene

In SOS's Appellee's Brief filed on March 8, 2021, SOS argues that the district court acted within its discretion in denying Movants' motion to intervene. Dkt. 00515770554. Pursuant to Rule 28(i), Plaintiffs adopt by reference the general legal analysis directed solely toward Movants in Parts I to III of the Argument in SOS's Appellee's Brief. Plaintiffs do not adopt the remainder of SOS's Appellee's Brief, nor any argument or factual characterization made in Parts I to III of the Argument that conflicts with any argument or factual characterization made by Plaintiffs in this brief, or that is against Plaintiffs' interests.

## VII. CONCLUSION

The Court should affirm the district court's order and remand for further proceedings on the remaining claims and relief.

Respectfully submitted this 15th day of March 2021,

 s/ *Hani Mirza*
**TEXAS CIVIL RIGHTS PROJECT**
Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**
Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
skalar@willkie.com
jsuriani@willkie.com

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7)(B), undersigned counsel certifies that this brief complies with the type-volume limitations contained therein, and states that exclusive of the portions exempted by FED. R. APP. P. 32(f), this brief contains 13,000 words. Undersigned counsel further certifies that, pursuant to FED. R. APP. P. 32(a)(5) and (6), this brief is printed in a proportionally-spaced, serif typeface using Century Schoolbook 14-point font in text and Century Schoolbook 12-point font in footnotes produced by Microsoft Word software. (the same program used to calculate word count).

s/ Hani Mirza

## CERTIFICATE OF SERVICE

On March, 15 2020, the foregoing Brief of Plaintiffs-Appellees was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned and is free of viruses.

s/ Hani Mirza